COVINGTON, Superintendent of Insurance, Ohio Department of Insurance, in his Capacity as Liquidator of American Chambers Life Insurance Company, Appellee and Cross–Appellant,

v.

. AMERICAN CHAMBERS LIFE INSURANCE COMPANY; Protective Life Insurance: Company, Appellant.

[Cite as *Covington v. Am. Chambers Life Ins. Co.,*
150 Ohio App.3d 119, 2002-Ohio-6165.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–1338.

Decided Nov. 14, 2002.

120

Betty D. Montgomery, Attorney General; Kegler, Brown, Hill & Ritter, Roger P. Sugarman and Jean M. Suh, for plaintiff.

Thompson Hine L.L.P., and Alan F. Berliner; Starnes & Atchison L.L.P., and W. Stancil Starnes, for appellant Protective Life Insurance Company.

---

LAZARUS, Judge.

{¶ 1}  Appellant, Protective Life Insurance Company ("Protective"), appeals from the October 25, 2001 journal entry and order denying Protective's motion for an order directing plaintiff-appellee, J. Lee Covington II, Superintendent of Insurance, Ohio Department of Insurance ("Superintendent"), to return assets of Protective.  The Superintendent has cross-appealed from the portion of the same entry granting Protective's motion to compel arbitration of the remaining claims between American Chambers Life Insurance Company ("American Chambers") and Protective.  For the reasons that follow, we reverse and remand.

{¶ 2}  The following facts are taken from the affidavit of Wayne E. Stuenkel, Senior Vice President and Chief Actuary for Protective, the documents attached to his affidavit, and the affidavit of Joseph G. Archdeacon, Deputy Liquidator of American Chambers.

{¶ 3}  Protective was established in 1907, and provides a wide array of insurance products throughout the United States.  In approximately 1988, American Chambers entered into a contract with Protective allowing American Chambers to market, administer, underwrite, and reinsure Protective's policies.  In exchange, Protective received fee income.

{¶ 4}  The agreement underwent a series of amendments and provided for the arbitration of "[a]ll disputes or differences between Protective and American Chambers which arise under or are related to this Agreement."  (Article 21 of the Agreement.)

{¶ 5}  In 1996, Protective agreed to advance $3 million in working capital to American Chambers and to assume the reinsurance risk for the first $6.25 million in quarterly premiums for the Vantage and Flex II Programs.  In return, American Chambers agreed to pay Protective, on a discounted basis, the net profit each quarter until the balance equaled $3 million (later increased to $4 million after Protective advanced another $1 million to American Chambers).  Under the agreement, American Chambers was required to pay Protective the net profit on the first $6.25 million of quarterly premiums with respect to the Vantage and Flex II Programs.  In addition, when American Chambers incurred a loss that was reimbursed by Protective, the balance was decreased by the discounted loss amount.  Pursuant to the agreement, American Chambers served

as third-party administrator and as reinsurer, to the extent that the earned premiums subject to the agreement exceeded $6.25 million per calendar quarter.

{¶ 6} Under the agreement, American Chambers administered the programs and paid all of the claims and expenses. American Chambers was granted the authority to sweep the premiums from Protective's lockbox and deposit them in the American Chambers' Premium Trust Account to pay claims. Some of the premiums were sent directly to American Chambers and then deposited directly into its Premium Trust Account. Ordinarily, American Chambers would then transfer funds to the claims account to pay the claims. The agreement specifically provided that "all such premiums shall be made payable to and remain the property of Protective." (Article 8[A][i] of the Agreement.) American Chambers was permitted to draw against the claims account solely to pay claims under the policies.

{¶ 7} Beginning in March 1999, American Chambers stopped making monthly settlements with Protective in which American Chambers was required to pay Protective the profit on the policies less certain expenses and fees. Protective made repeated requests for information on the financial status of American Chambers. American Chambers stopped paying claims in a timely manner and developed a backlog of unpaid claims. In February and early March 2000, American Chambers stopped paying expenses.

{¶ 8} In early March 2000, American Chambers swept the Protective lockbox and removed $2,021,314.09 in premiums. In addition, American Chambers received $185,073.28 in premiums directly, and failed to deposit them into Protective's claims account.

{¶ 9} On March 13, 2000, the Franklin County Court of Common Pleas issued an Order of Rehabilitation to American Chambers. On May 8, 2001, the court found American Chambers to be insolvent and appointed the Superintendent as Liquidator of American Chambers.

{¶ 10} Pursuant to his statutory authority under R.C. 3903.13 and 3903.18, the Superintendent took possession of the assets of American Chambers.

{¶ 11} On April 24, 2001, Protective filed a motion requesting an order directing the liquidator to return its assets and to compel arbitration of the remaining claims between Protective and American Chambers. The motion was fully briefed, and the trial court heard oral argument.

{¶ 12} On September 25, 2001, the trial court denied the portion of the motion requesting the return of funds but granted the motion to compel arbitration of the remaining claims. The trial court found that the Superintendent was entitled to keep the $2 million plus the amount of undeposited premiums that it was in possession of at the time the court ordered American Chambers into rehabilita-

tion for two reasons. First, the trial court found that there was no method of earmarking Protective's money. Second, the trial court found that the type of arrangement Protective had with American Chambers whereby Protective funneled its policies and claims through another insurance company lent itself to abuse of the statutory scheme for liquidation that is designed to protect insureds.

{¶ 13} This appeal followed, with Protective assigning as error the following:

{¶ 14} "The court below erred by (1) refusing to enforce Protective Life Insurance Company's ('Protective') contract with American Chambers Life Insurance Company ('American Chambers') on the grounds that the use of a third-party administrator was contrary to public policy; (2) ruling that 'American Chambers owned money that it swept from Protective's account' because 'there was not a method of earmarking Protective's money'; and (3) refusing to order the immediate return of Protective's funds."

{¶ 15} The Superintendent cross-appealed, assigning as error the following:

{¶ 16} "The trial court erred in granting Protective Life Insurance Company's Motion to Compel Arbitration."

{¶ 17} Protective's position is straightforward. Protective argues that the premiums swept from the lockbox are Protective's property and not part of the liquidation estate. Protective contends that American Chambers was merely a third-party administrator, acting as Protective's agent for purposes of collecting premiums and paying claims and expenses on Protective's policies. Protective argues that it was error for the trial court to find that American Chambers bore all of the risk on the policies when, in fact, American Chambers bore none of the risk, and Protective bore the risk on the policies. Thus, Protective claims that it was error for the trial court to void the ownership provision of the agreement on public-policy grounds.

{¶ 18} Protective further argues that, pursuant to the agreement between American Chambers and Protective, the contents of the lockbox and the premiums paid directly to American Chambers were, at all times, the property of Protective, and the Superintendent is obligated to return that property to its rightful owner. Finally, Protective argues that the absence of a method to earmark Protective's money does not result in a transfer of ownership from Protective to American Chambers.

{¶ 19} The Superintendent concedes that, if the funds swept from the Protective lockbox are Protective's property, they must be returned to Protective. However, the Superintendent claims that the funds swept from the Protective lockbox prior to the date of the rehabilitation order became and remain the property of the Superintendent in his capacity as rehabilitator and now liquidator. The Superintendent contends that American Chambers was more than just a

third-party administrator because under the agreement it agreed to provide reinsurance, market, and administer Protective's policies. The Superintendent argues that with respect to the Vantage and Flex II Programs, to the extent that earned premiums exceeded $6.25 million per calendar quarter, American Chambers assumed the reinsurance liability for claims under those policies, and was entitled to earned premiums and administrative fees stemming from those policies. In addition, the Superintendent points to language in the agreement that provides that all administrative or other fees remain the property of American Chambers. The Superintendent concludes that Protective must file a proof of claim like any other creditor in order to recover its losses and may not jump ahead of other creditors in the priority of distribution of the liquidation estate.

{¶ 20} On the state of the record before us, we are unable to ascertain whether the swept premiums relate solely and exclusively to administered policies and not to any reinsurance obligation with respect to the Vantage and Flex II Programs.[1] If, as Protective argues, all of the premiums that were swept were from the administered policies and not from any reinsurance obligations, then Protective's argument that the property is not part of the liquidation estate has merit and the Superintendent must return the premiums to Protective. If a portion of the swept premiums relates to the reinsurance obligations under the Flex II and Vantage Programs, and the trial court can ascertain what portion of the swept premiums relates to the administered policies, then the trial court should order those funds returned to Protective. R.C. 3903.13(A) states that "[t]he rehabilitator is vested by operation of law with the title to all property, contracts, and rights of action of the company as of the date of the entry of the judgment of the court order directing rehabilitation." Therefore, the Superintendent can have no greater right to ownership of the premiums than American Chambers had. Protective's first assignment of error is well taken and sustained.

{¶ 21} Turning to the cross-appeal, the Superintendent contends that the trial court erred in compelling the Superintendent to submit to arbitration a dispute over debits and credits between American Chambers and Protective that arose before the order of rehabilitation. The Superintendent argues that permitting arbitration usurps the authority of the liquidator to value all claims against the liquidation estate. The Superintendent also argues that the liquidator was

---

1. Reinsurance is insurance for insurance companies. Reinsurance permits an insurer to spread its insurance risk by assigning portions of the risk to other insurance companies acting as reinsurers in exchange for a share of the premiums. See, generally, *Colonial Am. Life Ins. Co. v. Commr. of Internal Revenue* (1989), 491 U.S. 244, 246–247, 109 S.Ct. 2408, 105 L.Ed.2d 199.

not a party to the arbitration agreement and, therefore, should not be bound by it. Finally, the Superintendent argues that in the liquidation context, policy arguments weigh against arbitration and in favor of the authority of the liquidator to pursue legal proceedings to accomplish the purposes of liquidation.

{¶ 22} Protective argues that Ohio law favors arbitration as a preferred method of dispute resolution, and that this court has previously upheld the validity of an arbitration provision in *Fabe v. Columbus Ins. Co.* (1990), 68 Ohio App.3d 226, 587 N.E.2d 966. Protective also argues that the Superintendent, as liquidator, stands in the shoes of the insolvent insurer, and therefore can have no greater rights than the insolvent. Since American Chambers was subject to the arbitration clause in the agreement between it and Protective, Protective argues that the Superintendent is similarly bound.

{¶ 23} In *Fabe,* this court looked at whether the Superintendent, as liquidator, was bound by a binding arbitration provision in an agreement between an insolvent insurer and reinsurers. The liquidator brought suit alleging that certain reinsurers owed money to the liquidation estate. The reinsurers sought a stay of the proceedings and an order requiring the liquidator to submit his asset collection suit to binding arbitration. As with many suits involving the liquidation statutes, this court looked to federal bankruptcy law for guidance in determining whether the arbitration clause should be enforced. This court stated:

{¶ 24} "A common link can be found among all of the bankruptcy decisions addressing this issue. An arbitration provision in a pre-petition agreement will not be enforced if the issues to be arbitrated involve specific bankruptcy issues that would seriously affect the rights of the creditors. However, where the matter which is sought to be arbitrated does not affect the rights and priorities of creditors, nor is there any other competing bankruptcy policy, arbitration is favored, if not required." Id. at 235, 587 N.E.2d 966.

{¶ 25} This court went on to hold in *Fabe* that enforcement of an arbitration provision is within the sound discretion of the court, and, in that case, the arbitration provision would be enforced. Id. at 235–236, 587 N.E.2d 966. This was because the dispute that the reinsurers sought to have resolved by arbitration did not affect the priority of creditors or adversely affect any party to the liquidation proceeding. Id. at 236, 587 N.E.2d 966. Such is not the case here.

{¶ 26} In this case, the issues Protective seeks to have resolved by arbitration primarily involve setoff and proof of claims. These are precisely the types of disputes that the Ohio insurance liquidation statutes were designed to resolve. The liquidator is required under R.C. 3903.43(A) to review, investigate, and value all claims filed in a liquidation. *Fabe v. Am. Druggists' Ins. Co.* (1990), 70 Ohio App.3d 595, 605, 591 N.E.2d 835. We read *Fabe v. Columbus Ins. Co.,*

supra, to stand for the proposition that enforcement of an arbitration provision is not mandatory if it would affect the priority of claims of creditors or adversely affect a party to the liquidation proceeding. Under these circumstances, compelling arbitration would affect the rights of other creditors and frustrate the purpose of the liquidation statute. Therefore, it was error to require the Superintendent to submit to arbitration. The cross-assignment of error is well taken and sustained.

{¶ 27} Based on the foregoing, Protective's assignment of error is sustained, and the matter is remanded to the trial court to make a factual determination as to whether any portion of the swept premiums and the premiums paid directly to American Chambers relate to reinsurance obligations or whether the premiums remain the property of Protective as they relate to administered policies. In addition, the cross-assignment of error is sustained, and, upon remand, the trial court is instructed that Protective's remaining claims against the liquidation estate are to be reviewed by the Superintendent in his capacity as liquidator.

Judgment reversed
and cause remanded with instructions.

BOWMAN and BROWN, JJ., concur.